**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TERRA A. ALBRIGHT, | ) | CASE NO.  5:10-cv-2274 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Defendant. | ) | **ORDER** |

Plaintiff, Terra A. Albright ("Plaintiff"), challenges the final decision of Defendant,

Michael J. Astrue, Commissioner of Social Security ("the Commissioner"), denying

Plaintiff's applications for Supplemental Security Income ("SSI") under Title XVI of the

Social Security Act, 42 U.S.C. § 1381 *et seq.* ("the Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States

Magistrate Judge pursuant to the consent of the parties entered under the authority of

28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final

decision is AFFIRMED.

# I.  PROCEDURAL HISTORY

On January 26, 2006, Plaintiff filed an application for SSI that alleged a disability onset date of January 1, 1993.  (Tr. 10.)  The application was denied initially and upon reconsideration, so Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. 10.)  On March 20, 2009, an ALJ held Plaintiff's hearing.  (Tr. 10.)  Plaintiff appeared at her hearing, was represented by an attorney, and testified.  (Tr. 10.)  A vocational expert ("VE") also appeared and testified.  (Tr. 10.)

On April 29, 2009, the ALJ found Plaintiff not disabled.[1]  (Tr. 21.)  On August 9, 2010, the Appeals Council declined to review the ALJ's decision, so the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)  On October 7, 2010, Plaintiff timely filed her complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  On February 4, 2011, Plaintiff filed her Brief on the Merits (Doc. No. 12), and on April 6, 2011, the Commissioner filed his Brief on the Merits (Doc. No. 14).  Plaintiff did not file a Reply Brief.

Plaintiff asserts six assignments of error, but they raise two main issues:  (1) whether the ALJ properly determined that Plaintiff's impairments did not meet or medically equaled listing 12.05 from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"); and (2) whether the ALJ's hypothetical to the VE accurately portrayed Plaintiff's limitations.

---

[1] Plaintiff had filed a prior application for SSI on July 30, 2003, that alleged a disability onset date of January 15, 2003.  (Tr. 10.)  The prior application was denied initially on December 8, 2003, and upon reconsideration on May 24, 2004.  (Tr. 10.)  Plaintiff never appealed; therefore, the decision became the Commissioner's final decision through May 24, 2004.  (Tr. 10.)  The ALJ found that good cause did not exist to reopen the prior case.  (Tr. 10.)

2

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Plaintiff was 15 years old on her alleged disability onset date and 28 years old on the date she filed her application for SSI.  (*See* Tr. 10, 20.)  She has a limited education and is able to communicate in English.  (Tr. 20.)  She does not have past relevant work experience.  (Tr. 20.)

### B.  Medical Evidence

Plaintiff underwent two intelligence tests as a child while in school.  (Tr. 134-37, 141-42.)  On April 16, 1985, when Plaintiff was seven years old, Plaintiff received a Verbal Intelligence score of 85, a Performance Intelligence score of 75, and a Full Scale Intelligence score of 79.  (Tr. 141.)  According to the administering school psychologist, the results indicated that Plaintiff was "functioning in the Borderline range of capabilities."  (Tr. 142.)  On July 27, 1993, when Plaintiff was sixteen years old, Plaintiff received a Verbal Intelligence score of 73, a Performance Intelligence score of 55, and a Full Scale Intelligence score of 62.  (Tr. 135.)  The administering school psychologist indicated that Plaintiff's scores showed that Plaintiff functioned in the "Mentally Deficient range."  (Tr. 135.)  The school psychologist noted that Plaintiff was "failing nearly all subjects," but received little academic support at home, did not appear to have any clear goals, and had a history of serious attendance problems.  (Tr. 134, 136.)  However, on August 25, 1993, Plaintiff passed the writing, reading, and citizenship portions of the ninth grade proficiency test administered by the state of Ohio (Tr. 132); and  a review of Plaintiff's high school transcript reveals that Plaintiff had

never been placed in special education classes (Tr. 131).

On January 27, 2007, consultative psychologist Dr. Frederick G. Leidal, Psy.D., performed an Adult Clinical Interview and Mental Status Examination of Plaintiff upon the request of the Bureau of Disability Determination.  (Tr. 214–20).  Dr. Leidal reported the following.  Plaintiff reported that she had a ninth grade education and had a history of placement in special education classes, but had never been diagnosed with a specific learning disorder.  (Tr. 214.)  Plaintiff expressed a belief that she was entitled to disability benefits because of her learning disabilities and problems with her back. (Tr. 215, 219.)  Plaintiff further reported that she had not attempted to work since she was 16 years old and did not feel that she should have to work for 6 or 7 dollars an hour.  (Tr. 215, 219.)

Plaintiff reported that she could perform activities of daily living, although she performed cooking and cleaning slowly and required breaks because she became tired and her arms would begin to hurt.  (Tr. 215.)  Plaintiff's ability to manage money, such as counting change and paying bills, appeared poor.  (Tr. 215.)  Dr. Leidal concluded that "[t]he level of assistance [Plaintiff] needed in planning or completing normal activities of daily living appears minimal at this time as the claimant seems to have functional adaptive skills."  (Tr. 215.)

Upon intelligence testing, Plaintiff had a Verbal Intelligence score of 74, Performance Intelligence score of 68, and Full Scale Intelligence score of 69.  (Tr. 218.) Dr. Leidal reported that Plaintiff's test results "appear[ed] to represent a low estimate of [Plaintiff's] cognitive ability due to low effort and motivation."  (Tr. 217.)  Dr. Leidal continued that Plaintiff "tended to dawdle and procrastinate . . . and made very

4

deliberate and slow attempts . . . resulting in lower than expected scores." (Tr. 217.)

Therefore, although the test results showed intellectual functioning in the "Mild Mentally

Retarded Range of Intelligence," Dr. Leidal concluded that Plaintiff's intelligence

"appear[ed] to be in the borderline range of intellectual functioning." (Tr. 217, 219.)

Dr. Leidal indicated that Plaintiff suffered bipolar disorder and obsessive-

compulsive disorder, as well as a personality disorder with borderline and dependant

traits; had borderline intellectual functioning, and assigned Plaintiff a Global

Assessment of Functioning ("GAF") score of 54.[2]

Dr. Leidal opined as to Plaintiff's functional capacity as follows. Plaintiff was

markedly impaired in her ability to manage money or benefits. (Tr. 220.) Plaintiff was

moderately impaired in abilities to do the following: relate to others in an appropriate

manner; accept instructions or criticism and respond to instruction in a work setting;

respond and adapt to changes with reasonable flexibility; work near others without

becoming overly distracted; sustain an ordinary routine without supervision or

prompting; maintain pace in completing tasks; understand, comprehend, and carry out

more complex levels of instruction and direction; perform activities within a schedule

and maintain attendance; and maintain employment, adapt to the work environment,

and tolerate stressors of the work environment. (Tr. 219-20.) Plaintiff was slightly

impaired in her abilities to recall and remember simple tasks or learn from instructions;

---

[2] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. A person who scores in this range may have a flat affect, occasional panic attacks, few friends, or conflicts with peers and co-workers. *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. rev., 2000).

5

persist in completing routine daily tasks or work-related tasks; and understand and carry out more detailed instructions.  (Tr. 220.)  Plaintiff was otherwise not impaired, including, "from a psychological perspective . . . [the] ability to obtain some kind of productive employment, without assistance."  (Tr. 220.)

On January 29, 2007, state agency reviewing psychologist Dr. Marianne Collins, Ph.D., authored a Psychiatric Review Technique form and assessed Plaintiff's mental residual functional capacity ("RFC").  (Tr. 2224-41.)  In her Psychiatric Review, Dr. Collins reviewed Plaintiff's records under Listings 12.04, 12.05, 12.06, and 12.08 and found that Plaintiff was moderately limited in her abilities to maintain social functioning and maintain concentration, persistence, or pace; mildly limited in performing activities of daily living; and had no episodes of decompensation.  (Tr. 234.)

Dr. Collins assessed Plaintiff's mental RFC as follows.  Plaintiff was markedly limited in her abilities to understand, remember, and carry out detailed instructions.  (Tr. 239.)  Plaintiff was moderately limited in her abilities to do the following:  maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and travel in

6

unfamiliar places or use public transportation.  (Tr. 239-40.)  Plaintiff was otherwise not

significantly limited.  (Tr. 239-40.)

Dr. Collins noted that Plaintiff had not been in special education classes.  (Tr.

241.)  Dr. Collins gave Dr. Leidal's opinions greater weight than Plaintiff's subjective

statements because Plaintiff's subjective statements were not supported by the record

evidence.  (Tr. 241.)  Dr. Collins concluded that Plaintiff "is capable of performing

simple routine tasks that she is motivated to perform, in settings [with] few changes,

occasional interaction with others, and would do better with tasks that do not require

strict time lines or productivity standards."  (Tr. 241.)

On August 28, 2007, Plaintiff was evaluated by psychologist Lynn Luna Jones,

Ph.D., to determine Plaintiff's ability to care for her children after her children were

removed from her care because of her inability to adequately control them.  (Tr. 255-

73.)  Dr. Jones indicated that Plaintiff had cancelled four prior appointments and had

declined to reschedule appointments on three occasions.  (Tr. 255.)  Dr. Jones

indicated that Plaintiff reported the following.

Plaintiff dropped out of school in the tenth grade because she did not like school.

(Tr. 258.)  She did not have a history of any learning disabilities.  (Tr. 258.)  She had

tubes placed in her ears when she was 4 years old; underwent surgery on her back for

scoliosis when she was 17 years old; suffered chronic ear infections for the past four

years; and underwent a hernia operation on August 27, 2007.  (Tr. 260.)  She had no

other medical problems.  (Tr. 260.)  Although she had been to the emergency room on

October 30, 2000, and December 22, 2004, those visits were related to hand and arm

injuries caused by her children.  (Tr. 260.)  She had been receiving outpatient treatment

7

at Portage Path Behavioral Health in 2001.  (Tr. 260.)

Dr. Jones noted that records showed Plaintiff attended several parenting classes at Akron Pregnancy Care, but after blurting out in one class, "this is fucking boring," she began leaving classes frequently.  (Tr. 260.)  Dr. Jones assessed Plaintiff with a GAF score of 45.[3]

Dr. Jones summarized that Plaintiff "is a dependent individual who urgently seeks another relationship as a source of support when one close relationship ends." (Tr. 271.)  Dr. Jones recommended that Plaintiff's children not be returned to Plaintiff because Plaintiff "is self-absorbed, immature, and . . . displays a permissive parenting style which has led to her children's failure to attend school, frequent physical altercations, and dangerous behaviors."  (Tr. 272.)

On February 25, 2009, staff from Portage Path Behavioral Health[4] authored a letter to Plaintiff's counsel and summarized Plaintiff's treatment records from May 23, 2007, to the present as follows.  (Tr. 304.)  Plaintiff suffered a mood disorder, learning disorder, obsessive-compulsive disorder, and borderline intellectual functioning.  (Tr. 304.)  Plaintiff denied depressive symptoms, and her obsessive-compulsive disorder

---

[3]  A GAF score between 41 and 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning.  A person who scores in this range may have suicidal ideation, severe obsessional rituals, no friends, and may be unable to keep a job.  *See Diagnostic and Statistical Manual of Mental Disorders*, *supra* note 1.

[4]  The Portage Path Behavioral Health staff who authored the February 25, 2009, letter are Ms. Jill Lowery, a licensed professional clinical counselor, and Ms. Donna Laughlin, a clinical nurse specialist.  (Tr. 304.)  Plaintiff appears to have been initially attended to by Dr. Manzoor E. Elahi, M.D., and subsequently attended to by Ms. Laughlin and another clinical nurse specialist.  (*See* Tr. 306-25.)

was controlled with medication.  (Tr. 304.)

**C.      Hearing Testimony**

**1.      Plaintiff's Testimony**

Plaintiff testified at her hearing as follows.  She quit school after the ninth grade because she struggled in school.  (Tr. 29.)  She was never in special education classes. (Tr. 29.)  She stopped working her part-time jobs as a teenager because she underwent back surgery to correct her scoliosis.  (Tr. 32.)  She does not have a primary care doctor.  (Tr. 33.)  She sometimes takes Vicodin or Ultram to relieve  her back, which she obtains from the emergency room where she presents for her back pain once or twice a month.  (Tr. 33.)

Plaintiff can stand for a couple of minutes at a time before she needs to sit down (Tr. 34), and can sit in one place for "a while" (Tr. 35).  She usually walks only as far as the bus stop, which is a block away from her home.  (Tr. 34.)  She is tired and lies down often during the day because she is depressed.  (Tr. 36-37.)  She takes three medications prescribed by her psychiatrist but they do not help her, as she continues to suffer anxiety, depression, and obsessive-compulsive behavior.  (Tr. 36, 39-40.)  She constantly washes her hands and checks the washer, dryer, coffee pot, stove, and locks on her doors.  (Tr. 36, 39-40.)  If she touches such things as chicken or cleaning products, she is compelled to take a shower immediately afterward.  (Tr. 36, 39-40.)

Plaintiff leaves her home three times a week.  (Tr. 37.)  She does not like to go outside or leave her home, and when she does leave home her husband or mother accompanies her.  (Tr. 38, 40-41.)  She is able to speak and get along with her

9

husband, mother, and siblings but she has no friends.  (Tr. 38.)  She has "a hard time"

with money; for example, if she and her husband go to the store, her mother has to

figure out how much items will cost and then give that amount of money to them.  (Tr.

42.)

### 2.    The VE's Testimony

The ALJ posed the following hypothetical person to the VE:

> I'd like you to assume a younger individual under the age of 50 with a ninth
> grade education.  This person would be limited to light work, which requires
> lifting and carrying 20 pounds occasionally, 10 pounds frequently.  Standing
> and walking a total of about six hours in eight.  Or sitting about six hours in
> eight.  This person would need to change position for a couple minutes every
> hour . . . .   This person should be limited to simple, routine tasks.  They
> should involve as little reading and math as possible but reading would be
> limited to the grade equivalent of the fifth grade.  Math would be limited to
> the fourth  grade.   And   there should  be superficial interaction  with co-
> workers, supervisors and the general public.  By that I mean no negotiation,
> arbitration, confrontation, negotiation over the division of duties, that sort of
> thing.   And then there should be no strict production quotas or vigorous
> production pace.

(Tr. 45.)  The VE began to testify that such a person could perform work as a

housekeeping cleaner, but the ALJ interrupted and indicated that he wanted to include

in his hypothetical an additional limitation that hypothetical person should avoid tasks

involving housecleaning and dealing with raw meat.  (Tr. 46.)  The VE testified that such

a hypothetical person could perform work as a retail trade marker (for which there were

approximately 900 jobs locally, 6,500 jobs in Ohio, and 180,000 jobs nationally), food

service worker (for which there were approximately 900 jobs locally, 4,500 jobs in Ohio,

and 125,000 jobs nationally), and mail clerk (for which there were 900 jobs locally,

4,500 jobs in Ohio, and 100,000 jobs nationally).  (Tr. 46.)  The VE further testified

upon the ALJ's questioning that the hypothetical person would not be able to perform

10

any work if she needed to lie down outside of customary work breaks.  (Tr. 47-48.)

Plaintiff's attorney posed the following hypothetical person to the VE:

[L]et's start with the Judge's hypothetical, I'll make some changes . . . .  The younger person, ninth grade education, however. . . the person is functionally illiterate, no jobs involving reading anything beyond the fifth grade level.  No math beyond the third grade level.  Light work, need to change positions.  And I want to also throw in the other restriction he stated about simple, routine tasks, superficial contact with others.  But I want to change the one about, the last one, no jobs requiring housecleaning and no handling of raw meat.  I'd change that to no jobs handling food at all.

(Tr. 48.)  The VE testified that such a hypothetical person could not work as a food

service worker.  (Tr. 48.)  The VE then confirmed upon Plaintiff's attorney's questioning

that the hypothetical person would not be able to perform any work if she needed to lie

down outside of customary work breaks.  (Tr. 48.)  Plaintiff's attorney then posed a

follow-up hypothetical as follows:

Let's take the lying down out of that hypothetical, but I want to add another one, another restriction.  This person needs to have someone close to her, close family, mother, husband accompany her whenever she leaves the home wherever she goes, in other words, the employer would have to accommodate having her mother or husband standing next to her at work all day.

(Tr. 48-49.)  The VE testified that such an accommodation would not be "something that

a typical competitive level employer would permit."  (Tr. 48.)

The VE testified that his definitions and descriptions of his proffered jobs were

consistent with the Dictionary of Occupational Titles; that his numbers of jobs were

based on information from Occupational Employment Quarterly; and that the jobs he

proffered were only samples and that there were other jobs that such a hypothetical

person could perform.  (Tr. 47.)

11

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot,* 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and*

12

416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since January 1, 1993.

2.    The claimant has the following severe impairments: scoliosis with instrumented fusion from T2-L1; bipolar disorder[;] obsessive compulsive disorder; personality disorder; and borderline intellectual functioning.

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4.    After careful consideration of the entire record, I find the claimant has the residual functional capacity to perform light work . . . meaning she can lift and carry 20 pounds occasionally and 10 pounds frequently. She can stand, sit, and walk for six hours in an eight-hour workday except she needs to be able to change positions for a couple minutes every hour; she can perform simple routine tasks not involving reading above the fifth grade level or math above the fourth grade level; she cannot perform tasks involving cleaning or handling raw meat; she can have superficial interaction with co-workers, supervisors, and the general public; she cannot work in a place that requires strict production quotas or rigorous production standards.

. . . . .

8.    Transferability of job skills is not an issue because the claimant does not have past relevant work.

13

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10.     The claimant has not been under a disability, as defined in the Social Security Act, since January 26, 2006, the date the application was filed.

(Tr. 10-21.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  _Ealy v. Comm'r of Soc. Sec._, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  _Heston v. Comm'r of Soc. Sec._, 245 F.3d 528, 535 (6th Cir. 2001).  Courts may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether that evidence has actually been cited by the ALJ.  _Id._  However, courts do not review the evidence _de novo_, make credibility determinations, or weigh the evidence.  _Brainard v. Sec'y of Health & Human Servs._, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  _White v. Comm'r of Soc. Sec._, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as

14

adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

### B.    The ALJ's Assessment of Whether Plaintiff's Impairments Met or Medically Equaled Listing 12.05

Plaintiff contends that the ALJ improperly determined that Plaintiff's impairments did not meet or medically equal Listing 12.05.  For the following reasons, the Court disagrees.

Listing 12.05 is as follows:

12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

A.  Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;

Or

B.  A valid verbal, performance, or full scale IQ of 59 or less;

Or

C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

Or

D.  A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1.  Marked restriction of activities of daily living; or

2.  Marked difficulties in maintaining social functioning; or

3.  Marked difficulties in maintaining concentration, persistence, or pace; or

4.  Repeated episodes of decompensation, each of extended duration.

Listing 12.05.

The ALJ provided a lengthy discussion of why Plaintiff did not meet any of the requirements for Listing 12.05, summarized as follows.  Plaintiff did not meet Paragraph A of the Listing because there was no evidence that Plaintiff was dependent on others to care for her personal needs and could not follow directions.  (Tr. 14, 15.)  Plaintiff did not meet Paragraphs B and C because Plaintiff's IQ scores of 70 and below were not valid (Tr. 14-15, 19); and because "the longitudinal evidence as a whole does not indicate the impaired level of functioning that would be expected of an individual with mental retardation" (Tr. 15).  Plaintiff did not meet Paragraph D because Plaintiff's IQ scores of 70 and below were not valid (Tr. 14-15, 19); and because Plaintiff had only moderate difficulties in social functioning and moderate difficulties in concentration, persistence, or pace, and had no episodes of decompensastion (Tr. 13).

Plaintiff contends that the ALJ improperly determined that Plaintiff's impairments did not meet or medically equal Listing 12.05 because:  (1)  the ALJ failed to explain why he gave Plaintiff's IQ scores from 1993 no weight; (2) the ALJ gave Plaintiff's IQ scores from 1985 more weight that her IQ scores from 1993 contrary to Listing 112.00(D)(10); (3) the ALJ refused to consider Plaintiff's argument that Plaintiff suffered deficits in adaptive functioning based on the fact that no treating source diagnosed Plaintiff with mental retardation; and (4) the ALJ misconstrued the evidence he cited in

16

support of his determination.  The Court finds that Plaintiff's contentions lack merit and

that the ALJ's determination is supported by substantial evidence.

The ALJ explained why he gave Plaintiff's IQ scores from 1993 no weight:

> There is no evidence claimant's IQ scores have declined due to any head
> injury or other organic brain damage.  In the absence of any cause for a
> decline in intellectual functioning, I properly give the greatest weight to the
> highest IQ scores, since it is possible to underachieve on IQ testing due to
> lack of effort, but it is not possible to feign higher levels of intelligence than
> one actually possesses.

(Tr. 14.)  Moreover, the ALJ noted that, in August 1993, Plaintiff remained in regular

classes and passed all sections of the ninth grade proficiency test except the

mathematics section.  (Tr. 19.)  The ALJ concluded that the evidence showed Plaintiff

did poorly in her regular classes because Plaintiff had poor attendance rather than

because of a learning disability.  (Tr. 19.)  Accordingly, Plaintiff's contention that the

ALJ provided no explanation for giving Plaintiff's IQ scores from 1993 no weight lacks

merit.

The Court is not persuaded that the ALJ violated Listing 112.00(D)(10) when he

gave Plaintiff's IQ scores from 1985 greater weight than her IQ scores from 1993.

Listing 112.00 is located in Part B of the Listings and regards the evaluation of mental

disorders of children under age 18.  Listing 112.00(D)(10) provides the following:

> IQ test results must also be sufficiently current for accurate assessment
> *under 112.05.*  Generally, the results of IQ  tests tend to stabilize by the age
> of 16. Therefore, IQ test results obtained at age 16 or older should be viewed
> as a valid indication of the child's current status, provided they are
> compatible with the child's current   behavior. IQ test results obtained
> between ages 7 and 16 should be considered current for 4 years when the
> tested IQ is less than 40, and for 2 years when the IQ is 40 or above.  IQ test
> results obtained before age 7 are current for 2 years if the tested IQ is less
> than 40 and 1 year if at 40 or above.

Listing 112.00(D)(10) (emphasis added).  The plain language of Listing 112.00(D)(10) indicates that its terms apply to the assessment of a claimant under Listing 112.05, not Listing 12.05 under which the ALJ assessed Plaintiff; and Plaintiff does not explain how Listing 112.00(D)(10) applies to the ALJ's assessment of Plaintiff under Listing 12.05. Moreover, the plain language of Listing 112.00(D)(10) provides that "IQ test results obtained at age 16 or older should be viewed as a valid indication of the child's current status, *provided they are compatible with the child's current  behavior*."  Listing 112.00(D)(10) (emphasis added).  Here, the ALJ noted that, in August 1993, Plaintiff remained in regular classes and passed all sections of the ninth grade proficiency test except the mathematics section, and concluded that Plaintiff did poorly in her regular classes because Plaintiff had poor attendance.  (Tr. 19.)  In other words, the ALJ found that Plaintiff's IQ scores from 1993 were not compatible with Plaintiff's behavior at that time; therefore, the ALJ was not required to give those scores particular weight. Accordingly, Plaintiff's contention that the ALJ violated Listing 112.05(D)(10) lacks merit.

Plaintiff's contention that the ALJ improperly refused to consider her argument that she suffered deficits in adaptive functioning lacks merit because the ALJ did not refuse to consider Plaintiff's argument.  The ALJ stated that, because "there is no valid diagnosis of mental retardation . . . the issue of deficits in adaptive functioning is moot"; however, the ALJ decided to considered whether Plaintiff met any of Listing 12.05's paragraphs because "counsel stressed this listing so strenuously in his oral and written argument."  (Tr. 14.)  The ALJ found that "there are no deficits in adaptive functioning during the developmental period before age 22" (Tr. 13), and concluded that "the

longitudinal evidence as a whole does not indicate the impaired level of functioning that would be expected for an individual with mental retardation" (Tr. 15).  In other words, the ALJ considered whether Plaintiff suffered deficits in adaptive functioning based on the record as a whole.

Finally, for the following reasons, Plaintiff's contention that the ALJ misconstrued the evidence lacks merit.  Plaintiff explains that the ALJ improperly supported his determination with the following inaccurate findings:  Plaintiff lived independently; Plaintiff was never placed in special education classes; Plaintiff lost custody of her children because she had poor parenting skills, not because she lacked the cognitive ability to raise her children; and Dr. Leidal found that Plaintiff's IQ scores were invalid.  A review of the record evidence shows, however, that the ALJ's findings are supported by the record.

The ALJ found that Plaintiff "lived independently *or with her husband*."  (Tr. 14) (emphasis added).  This finding is supported by the record evidence, as it is undisputed that Plaintiff lived with her husband and Dr. Leidal opined that Plaintiff could take care of herself with only minimal support.  Plaintiff admitted that she had not taken special education classes, and the fact that Plaintiff had not been placed in special education classes supports the reasonable inference that Plaintiff functioned at a higher level.  Dr. Jones recommended that Plaintiff's children not be returned to Plaintiff because Plaintiff "is self-absorbed, immature, and . . . displays a permissive parenting style which has led to her children's failure to attend school, frequent physical altercations, and dangerous behaviors."  (Tr. 272.)  Dr. Jones's opinion supports the ALJ's finding that Plaintiff's children were removed from Plaintiff's home because of Plaintiff's poor

parenting skills rather than any cognitive deficits.  Finally, although the ALJ stated that

Dr. Leidal found Plaintiff's IQ scores "invalid" (Tr. 14.) and Dr. Leidal did not make such

a statement, it is clear that Dr. Leidal found the IQ scores "unreliable," which is

supported by the evidence as Dr. Leidal explained that Plaintiff's scores were

underestimates caused by Plaintiff's poor motivation and effort.  Accordingly, there is no

basis to conclude that the ALJ misconstrued the evidence.

Substantial evidence supports the ALJ's finding that Plaintiff's IQ scores from

1993 and 2007 were "invalid."  The regulations do not limit the question of validity to

test results alone in isolation from other factors.  *Brown v. Sec'y of Health & Human

Servs.*, 948 F.2d 268, 269 (6th Cir. 1991).  In assessing the validity of a claimant's IQ,

information from both medical and non-medical sources may be used to obtain detailed

descriptions of the individual's activities of daily living, social functioning, concentration,

persistence and pace; or ability to tolerate stress.  *Id.* (quoting 20 C.F.R. Pt. 404, Subpt.

P, App. 1, § 12.00(D)).  Here, the ALJ did not give Plaintiff's IQ scores from 1993

weight because there was no evidence of a head injury or organic brain damage to

explain a decrease in Plaintiff's IQ scores, and because they were inconsistent with

Plaintiff's contemporaneous behavior.  The ALJ did not give Plaintiff's IQ scores from

2007 weight because Dr. Leidal stated that Plaintiff's motivation and effort during

testing was poor and that, although the scores themselves indicated functioning in the

mentally retarded range, her performance was actually within the borderline range—a

higher level of functioning.  These were sufficient reasons to give the IQ scores no

weight.

Plaintiff cites *Brown v. Secretary of Health and Human Services*, 948 F.2d 268

20

(6th Cir. 1991), in support of the proposition that the ALJ erroneously considered the facts that Plaintiff had been married three times, gave birth to five children, and was able to take care of her personal needs to determine that Plaintiff was not mentally retarded under the Listings.  For the following reasons, *Brown* is inapposite.  In *Brown*, the plaintiff was assigned a valid Full Scale IQ score of 68, which evidenced mild mental retardation.  *Brown v. Sec'y of Health & Human Servs.*, 948 F.2d 268, 270-71 (6th Cir. 1991).  Nevertheless, the Secretary of Health and Human Services argued that substantial evidence showed Plaintiff was not mentally retarded despite the IQ score because Plaintiff could use public transit; had a driver's license; visited friends; could make change at a grocery store; could do his own laundry and clean his room; completed the sixth grade; had a limited level of reading comprehension; and worked as a truck driver, which required him to record mileage, the hours he worked, and the places he drove.  *Id.* at 271.  The court, however, recognized that mildly mentally retarded individuals could acquire academic skills up to approximately sixth-grade level and, during their adult years, could usually achieve social and vocational skills adequate for minimum self-support.  *Id.*  Therefore, the court rejected the Secretary's argument that Plaintiff was not mildly mentally retarded despite the valid IQ score.  *Id.* *Brown* is inapposite here because Plaintiff had more than a sixth grade education and substantial evidence supports the ALJ's conclusion that Plaintiff's IQ scores of 70 and below were invalid.

Because Plaintiff's assignments of error regarding the ALJ's analysis of Listing 12.05 lack merit and substantial evidence supports the ALJ's determination that

Plaintiff's impairments do not meet or medically equal Listing 12.05, remand is not warranted on these bases.

### C.    The ALJ's Hypothetical to the VE

Plaintiff contends that the ALJ's hypothetical question to the VE should have contained two additional impairments:  the need to lie down during the day outside normal work breaks, and the need to be accompanied by a close family member outside the home.  Plaintiff does not cite to any law in support of her contention that the ALJ should have included such limitations in his hypothetical, and Plaintiff does not explain how the ALJ's refusal to include such limitations in his hypothetical harmed her. Moreover, an ALJ is not required to include all of a claimant's alleged limitations in his hypothetical to a VE; rather, an ALJ is required to include only those limitations that he finds credible.  *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

Here, the ALJ recognized Plaintiff's testimony that she did not like to leave her home alone and needed to lie down periodically during the day (Tr. 16); but he explained that he found such alleged limitations not credible for the following reasons:

> No additional nonexertional limitations are supported by the record, considering that claimant has sought mental heath treatment only sporadically and sparsely, that the treatment notes do not document significant signs of mental status abnormalities, that the claimant has never been hospitalized on an inpatient psychiatric basis, and that the claimant has often failed to take prescribed psychotropic medications.

(Tr. 17.)  The ALJ rejected Plaintiff's attorney's hypothetical to the VE that contained the additional limitation of requiring constant company and supervision for the following reasons:

22

> The preponderance of the evidence does not support counsel's hypothetical question . . . involving a person who would need to have her mother, or someone else present and accompanying her to work, and supervising her all day at work.  No treating, examining, or consultative source has ever stated the claimant is that functionally limited or requires that degree of constant supervision, and the evidence as a whole does not support such an extreme limitation.

(Tr. 21.)

Plaintiff does not explain how the ALJ's credibility assessment was deficient. Plaintiff only contends that the alleged additional limitations are consistent with a diagnosis of depression and the rest of the evidence.  But whether substantial evidence supports the inclusion of such additional limitations is beside the point, as a decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.  Accordingly, this assignment of error lacks merit.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date:  October 12, 2011